# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

    Plaintiff,

v.                                                         CRIMINAL CASE NO. 1:05CR67

GABRIEL PAUL MASCIOLI,

    Defendant.

## OPINION / REPORT AND RECOMMENDATION

On the 10th day of August, 2005 came the Defendant, Gabriel Paul Mascioli, in person and by William L. Pennington, his counsel, and also came the United States by its Assistant United States Attorney, John Parr, for evidentiary hearing and argument on Defendant's Motion To Exclude, which was filed July 28 and 29, 2005 [Docket Entry 10 and 11].

No pre-hearing motions having been made, the matter came on to be heard on the written Motion To Exclude, together with memorandum of law filed in support; the United States' Response to Defendant's Motion To Exclude, filed August 5, 2005; the duly sworn testimony of Agent Nicoloff, Senior Trooper Michael Manning and Gabriel Paul Mascioli; Government Exhibits 1 through 6; and upon the argument of counsel for Defendant and counsel for the United States.

## I.

## Procedural History

Defendant was indicted and is pending a September 12, 2005, trial on charges that he conspired to distribute methylenedioxy-methamphine, a drug also know as Ecstasy. The matter was referred to the undersigned by Order dated August 3, 2005. Pursuant to the initial scheduling order dated July 11, 2005, Defendant filed a Motion To Exclude "statements made while in custody and detention at the Pittsburgh International Airport." Defendant contends that Agent Richard P.

Nicoloff, in the company of West Virginia State Trooper Michael Manning and other law enforcement personnel associated with the Pittsburgh International Airport, met Defendant at the gate on his deplaning and coerced or pressured him into giving the inculpatory statements which Defendant now seeks to exclude. The United States contends that Defendant's statements were voluntarily made and that he was never in custody so as to trigger the requirement that *Miranda* warnings be given. The issue having been joined and the evidentiary hearing having been completed on August 10, 2005, the matter was taken under consideration for the preparation of this Opinion / Report and Recommendation.

## II.

### Findings Of Fact

After consideration of all of the evidence presented at the August 10, 2005, hearing, the undersigned, by a preponderance of evidence, makes the following findings of facts:

On September 27, 2003, at the Peace Bridge entry into Buffalo, New York, from Canada, a New York registered vehicle was stopped by agents of the Border Patrol. Benjamin Boswell and A. J. Atkins were questioned and detained relative to their attempt to smuggle 1,600 tablets of Ecstasy and three ounces of Ketamine into the United States. Boswell and Atkins told the investigators that 500 of the Ecstacy tablets were intended for delivery to Gabriel Mascioli in Morgantown, West Virginia.

On May 1, 2004, Senior Special Agent Nicoloff and West Virginia State Trooper / Drug Task Force Officer Michael Manning visited Mascioli's mother's house located in Morgantown, West Virginia, in an attempt to locate Mascioli. The officer advised Mascioli's mother that he was a criminal investigator and that he desired to talk with her son. Mascioli's mother advised the agent

2

that Mascioli was living in Las Vegas, Nevada. The agent left his business card with Mascioli's mother.

Mascioli's mother called her son in Las Vegas and advised him that an agent had come to her house and that "he (Mascioli) had to talk to the agent." Reacting to his mother's call, Mascioli called Agent Nicoloff and told him: he would come to West Virginia; he knew what the agent wanted to talk to him about[1]; and he did not want to talk to the agents in the presence of his parents. Mascioli testified that he had no initial plans to return to West Virginia from Las Vegas where he had been living for the past eight (8) months while trying to start a clothing business and, but for the call from his mother, would not have returned when he did. He also testified the only reason he arranged to return to West Virginia was because Agent Nicoloff said he had to come back to answer questions and threatened him with: "Don't make me come out there to get you." Agent Nicoloff denies making any such statement or any statement that could have been construed as a threat.

Mascioli made flight arrangements for the trip from Las Vegas to Morgantown over the Internet. After making the necessary flight arrangements, Mascioli first called his mother to tell her of his plans to come home and then called Agent Nicoloff on May 5, 2004, to tell the agent the flight number and time of arrival at Pittsburgh International Airport and at Hart Field in Morgantown, West Virginia, on May 6, 2005.

The investigation involving Mascioli was a joint investigation involving state and local drug task force police as well as federal immigration and customs officers. Although not discussed

---

[1]According to Mascioli, he had been called by Boswell or Atkins after their apprehension at the US / Canadian border and had been told that they had told the authorities about him because they knew he did not have anything at his place in Morgantown. Mascioli's father also told him that the police had come to his (the father's) store in Morgantown and told him that his son was being investigated for drug dealing.

3

specifically during the second telephone conversation with Mascioli, Agent Nicoloff believed any interview of Mascioli would be more successful if it were to be conducted outside the influence of Mascioli's parents. Therefore, Agent Nicoloff decided to meet Mascioli at the Pittsburgh International Airport when his plane arrived on May 6, 2004. Agent Nicoloff called J.J. Antelock and advised him that Mascioli was returning to West Virginia. Antelock was not available to join with Agent Nicoloff in the interview of Mascioli. Instead, arrangements were made with Senior State Trooper Michael Manning to accompany Agent Nicoloff to Pittsburgh to interview Mascioli.

Recognizing that Senior Trooper Manning did not have clearance to be on the air side of the Pittsburgh International Airport Terminal and that Agent Nicoloff did not have authority to escort Manning to the air side, the agent connected Manning with the Allegheny County Police to obtain an escort to the air side from the landside. Once at the gate where Mascioli's plane was to arrive, Agent Nicoloff and Senior State Trooper Manning waited in the hall or corridor outside the gate.

Mascioli deplaned and entered the public gate area. Neither Manning or Nicoloff were in uniform and neither of them knew Mascioli, and Mascioli was not expecting to be greeted by officers. Nicoloff approached one passenger from the Las Vegas flight and asked if he were Gabriel. Upon learning he was not, Nicoloff spotted another person who was standing after coming in from the skyway and asked him if he was Gabriel. Mascioli acknowledged he was and the agent introduced himself and Trooper Manning. Mascioli testified he asked the Agent "What happened to Morgantown?." Agent Nicoloff asked Mascioli if they could talk and Mascioli indicated they could. According to Agent Nicoloff, the three officers (Nicoloff, Manning and (TNU) Allegheny County Police Officer) and Mascioli casually walked toward McDonalds and other stores and vendors located in the airport air side of the terminal. Mascioli denies any knowledge of an intent

4

to conduct the interview at McDonalds. Mascioli testified he thought there was more than one uniformed officer, perhaps Pennsylvania State Police, who accompanied him, Agent Nicoloff and Senior Trooper Manning away from the arrival gate. Nicoloff testified it was the expressed intent to go to McDonalds for the interview but that it was too crowded with passengers to permit meaningful dialogue. Nicoloff then led Mascioli and the others toward an office in the customs area of the airport near international arrivals and departures because he was familiar with the area and suspected they could find a room that they could use for the interview. Nicoloff and Mascioli were in front followed by Manning and the other officer.

After stopping in an office and learning that a conference room / lunch room[2] was available, Agent Nicoloff, Senior State Trooper Manning and Mascioli entered the room. The Allegheny County police officer remained outside. The door to the conference room was left open according to Agent Nicoloff and Senior State Trooper Manning. Mascioli testified the door was closed. There is no dispute that the conference room was located in the customs / border protection area of the air side of the airport, which was slightly more secure that the other air side areas of the airport. The officers interviewed Mascioli for approximately one hour to one and a half hours. No video or audio recording of the interview was made. Agent Nicoloff made notes, which were later used in the preparation of the two-page typewritten statement attributed to Mascioli and which Mascioli now seeks to exclude. During the interview, no one told Mascioli that he was under arrest or detained or otherwise not free to go. According to Agent Nicoloff, Mascioli sat in a chair closest to the door

---

[2]Agent Nicoloff testified there was a refrigerator in the room and that a person came into the room during the interview of Mascioli and got her lunch. Mascioli testified he did not observe a refrigerator in the room and he did not remember seeing anyone coming in to get her lunch.

and had his cellular phone, which he used to call his mother and to receive two calls during the interview. According to Agent Nicoloff, he had no warrant for Mascioli's arrest and did not intend to arrest him even if Mascioli refused to talk with him. It is undisputed that during the interview Mascioli asked the officers what happened if he missed his connecting flight to Morgantown. The officers testified they offered him a ride. Mascioli testified they offered to give him a ride "after he answered a few questions." It is undisputed that Mascioli placed a call on his cell phone and told his mother that he had a ride to Morgantown and asked that she pick his luggage up at the Morgantown airport. Mascioli admitted during his testimony that the officers had told him he was going home.

During the interview, Mascioli did not ask to terminate it. Mascioli testified he asked the agent: "Do I need a lawyer?" and further testified that the agent told him he did not. He also testified Agent Nicoloff told him if he did not cooperate, he would be charged with obstruction of justice. The agent and the senior state trooper each denied that Mascioli said anything indicating that he wanted a lawyer or that anything was said indicating he would be charged with obstruction of justice if he did not cooperate. Mascioli also testified he was afraid because the police had shown up in Pittsburgh; because of what the police allegedly said to him; and because of where the interview took place within the air side of the Pittsburgh International Airport. It is undisputed that no one gave Mascioli a *Miranda* warning. Mascioli challenges the accuracy of Agent Nicoloff's two-page report of the May 6, 2004, interview but does not contest that the interview was completed or that Agent Nicoloff prepared the report of the interview. Mascioli challenges the accuracy of the report in that it does not mention the alleged 500-tablet quantity of Ecstacy that Boswell and Atkins allegedly told police at the Peace Bridge border crossing was earmarked for delivery to Mascioli in

6

Morgantown.

After the interview, Agent Nicoloff drove Mascioli to his parents' home in Morgantown.

Subsequent to the May 6, 2004, interview, Mascioli twice called Agent Nicoloff. During the first call, Mascioli told Agent Nicoloff that he was looking into some of the matters that interested the police. In June 2004, Mascioli called J.J. Antelock to arrange a meeting at the Wharf District in Morgantown. The meeting took place, but Mascioli, Agent Nicoloff and other police ended up at the then partially completed state police offices located near the West Virginia University Coliseum. At that meeting, Mascioli told Agent Nicoloff there was nothing more he could do for the investigation because some of his associates had been arrested by the police.

### III.

### Conclusions Of Law / Discussion

**Statements Made By Defendant Were Not Made Incident To A Custodial Interrogation**

*Miranda* warnings are required when a person is subjected to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966) and Dickerson v. United States, 530 U.S. 428, 444 (2000). The prevailing test for whether a person is "in custody" during interrogation triggering *Miranda* warnings is whether, when viewed from a totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984); United States v. Photogrammetric Data Services, 259 F.3d 229, 240-242 (4th Cir. 2001), *cert. denied,* 535 U.S. 926 (2002); and United States v. Howard, 115 F.3d 1151, 1154 (4th Cir. 1997).

In the instant case, defendant contends he was subjected to a custodial interrogation on May 6, 2004. The undersigned rejects this contention. Defendant was interviewed (questioned or interrogated) in an office adjunct to the customs area serving arriving and departing international

7

flights. He was not in a police station. Even if he had been in a police station, that in and of itself would not be enough to establish custody provided he would perceive that his freedom of movement was not constrained to a degree associated with arrest. Id. at page 1155. Mascioli indicated a willingness to talk with the agents at the Pittsburgh International Airport. He voluntarily accompanied them past the restaurant area within the air side of the airport to the customs area where the interview took place. He did not protest that he wanted to or had to catch a plane to Morgantown. Instead, he asked what would happen if he missed his connecting flight to Morgantown and was told that the agents would give him a ride. Not only did Mascioli use his private cell phone to call his mother during the interview and advise her that he would not be on the flight to Morgantown, but he used it to tell her he would catch a ride with the agents. True to their word, after the interview, agent Nicoloff gave Mascioli a ride to his mother's house in Morgantown. Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Mascioli was not told he was under arrest. Mascioli was not handcuffed or otherwise restrained. The officers did not brandish any weapons. In fact, they were not armed  Mascioli sat in a chair near the open door to the conference room where the interview took place. Not only did he have constant access to his personal cell phone during the interview, but he used it to receive two calls after using it to talk to his mother. In addition, Mascioli elected to fly from Las Vegas to West Virginia, it being his intent to talk with the officers once he arrived in West Virginia. Mascioli elected to call Agent Nicoloff and tell him his flight schedule for the trip from Las Vegas to Morgantown. Nothing in these facts indicates to the undersigned that Mascioli was in custody or that any reasonable person under the same or similar circumstances would not feel free to depart. Stansbury v. California, 511 U.S. 318, 325 (1994). Mascioli's assertions to the contrary, he could have declined the interview and insisted on going to

8

the gate and boarding the flight from Pittsburgh to Morgantown.

**Statements Made By Defendant Were Not Coerced**

Defendant contends his statement made on May 6, 2004, was the result of coercion. A statement is involuntary within the meaning of the due Process Clause if it is "extracted by ... threats or violence" or "obtained by ... direct or implied promises" or "the exertion of ... improper influence." United States v. Braxton, 112 F.3d 777, 780 (4th Cir 1997). The central question is whether the conduct of the interrogator was such that the Defendant's will was "overborne" or his "capacity for self determination critically impaired." United States v. Pelton, 835 F.2d 1067, 1071-72 (4th Cir. 1987).

Mascioli makes three major assertions in support of his contention that his statement was not voluntary:

1) First, Mascioli contends he was forced to come to West Virginia from Las Vegas by threats and intimidation of Agent Nicoloff. These alleged threats or words of intimidation were communicated through Defendant's parents to Defendant before he flew from Las Vegas to West Virginia. Defendant asserts he had no intention or plan of coming to West Virginia until the agents visited his parents seeking information of his whereabouts. When his mother called him, she made it clear *he had to call the agent*. However, there is nothing to indicate that the agent told Mascioli's mother that he had to call him or that there would be consequences if he did not call him. In addition, Mascioli was in Las Vegas. He could easily have refused to call the agents, leaving them to their own devices as to what to do, if anything, about his refusal to cooperate. Instead, Mascioli voluntarily called the agent on the phone – not once but twice. The undersigned does not find Mascioli's testimony credible

9

with regard to this alleged threat and does not find, based on the statement by the mother to her son, that *he had to call the agent* constituted a threat.

2) Second, Mascioli asserts the language of the agent was coercive and threatening during the phone call Mascioli placed to Agent Nicoloff prior to arranging his flight from Las Vegas to West Virginia. Even assuming Agent Nicoloff made a statement to the effect: "Don't make me come get you," such a statement is not coercive or threatening nor, in the context of the conversation, can it be construed as coercive or threatening. United States v. Elie, 111 F.3d 1135, 1143-44 (4th Cir. 1997) holding that police statements that he would "face five years" if he did not "come clean" or that they "needed" to speak to the defendant were coercive so as to render the subsequent statement involuntary. See also Braxton, *supra* at 782 and Pelton, *supra* at 1073.

3) Finally, Mascioli asserts that the surprise of seeing the officers at the Pittsburgh International Airport, coupled with being taken to the conference room or office where the interview took place flanked by officers in uniform and with being interviewed in a room away from the public at a time when his connecting flight with luggage were proceeding on to his Morgantown destination, scared him into cooperating with the agents. The undersigned does not find Mascioli's testimony credible. The undersigned finds there was only one uniformed Allegheny County police officer who accompanied Agent Nicoloff, Senior State Trooper Manning and Mascioli to the interview room. The undersigned finds that the uniformed officer stayed outside of the interview room during the interview. The undersigned finds that the door to the interview room was left open during the interview and that at least one person entered and left the interview room to retrieve her lunch during the course of the one to one-

and-a-half-hour interview. The undersigned finds that Mascioli's testimony to the effect that he was afraid or felt intimidated is influenced by his own self interest and is less than credible under the totality of the circumstances present on May 6, 2004, and, accordingly, gives it little significance. Braxton, *supra* at 781.

**Defendant Did Not Request Counsel During Interrogation**

Mascioli testified he asked Agent Nicoloff if he needed counsel. First, the undersigned finds by a preponderance of the evidence that Mascioli's testimony in this regard is not credible. Both Agent Nicoloff and Senior State Trooper Manning denied the inquiry was made. Mascioli did not provide the undersigned with any testimony or other evidence of whether he had considered the presence of legal counsel prior to leaving Las Vegas; whether he had made any arrangements for legal counsel to meet him in Morgantown prior to his leaving Las Vegas; did not discuss the need for counsel with his mother but instead limited his conversation to the fact that he had met the agent in Pittsburgh, was going to miss his connecting flight to Morgantown, would catch a ride to Morgantown with one or both agents and needed someone to pick up his luggage at Hart Field.

Even if Mascioli made such a statement, that does not amount to a request for legal counsel cognizable under the law.

The Courts have addressed the situation of a suspect in custody, after being *Mirandized* and during questioning, who makes an ambiguous request for counsel. In Davis v. United States, 512 U.S. 452, 455, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court held that a suspect must clearly and unambiguously request a lawyer to invoke his Fifth Amendment right to counsel. Davis's statement, "Maybe I should talk to a lawyer," was not a sufficiently unambiguous request for counsel to require that authorities cease questioning. *Id.* The Fourth Circuit addressed the post-

*Miranda* waiver situation in its unpublished opinion of US v. Wheeler, 84 Fed. Appx. 304 (4th Cir. 2003): "We hold that Wheeler's statement in this case that he wanted to 'call [his] family to see about a lawyer,' (J.A. at 84.), likewise is not a clear, unambiguous request for counsel." [3]

---

[3]The fourth Circuit has addressed in detail the cases deciding what is and what is not an unambiguous request for counsel in United States v. Johnson, 400 F.3d 187, 194-196 (2005): To invoke the right to counsel, a suspect must take an action that "can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil,* 501 U.S. at 178, 111 S.Ct. 2204. The district court found that Johnson "at the time of his first statement was asserting a right to remain silent without a lawyer present." But the court committed legal error in failing to recognize that *Edwards* and its progeny create a "bright-line rule that *all* questioning must cease" when an accused asserts his right to counsel. *Smith,* 469 U.S. at 98, 105 S.Ct. 490. If police initiate subsequent questioning, any statement by the suspect is presumed involuntary and is, accordingly, inadmissible at trial. *See id.* at 95.

The Government concedes that in *Edwards* the Supreme Court established a bright-line rule. Yet, without expressly suggesting that the district court erred in its fact-finding, the Government argues that the *Edwards* rule does not apply here because Johnson did not unambiguously **\*195** invoke his right to counsel. The Government relies on *Davis v. United States,* in which the Supreme Court stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The Government apparently maintains that Johnson, like Davis, did not "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

The defendants in *Davis*, and the cases relying on it, voiced mere equivocal requests for counsel, such as, "Maybe I should talk to a lawyer," *id.* at 462, 114 S.Ct. 2350; "I might want to talk to an attorney," *United States v. Zamora,* 222 F.3d 756, 765-66 (10th Cir.2000); "I think I need a lawyer," *Burket v. Angelone,* 208 F.3d 172, 198 (4th Cir.2000); "Do you think I need an attorney here?," *Mueller v. Angelone,* 181 F.3d 557, 573-74 (4th Cir.1999); I "might want to get a lawyer then, huh?," *United States v. Posada-Rios,* 158 F.3d 832, 867 (5th Cir.1998); "I think I want a lawyer," "Do you think I need a lawyer?," *Diaz v. Senkowski,* 76 F.3d 61, 63-65 (2d Cir.1996); "I can't afford a lawyer but is there anyway I can get one," *Lord v. Duckworth,* 29 F.3d 1216, 1219-21 (7th Cir.1994).

In contrast, Johnson did not equivocate. Rather he unequivocally indicated in writing that he did not "want to make a statement at this time without a lawyer." This statement was more *un* equivocal than those statements that courts have found do trigger *Edwards* ' bright-line rule. *See, e.g., Smith,* 469 U.S. at 93, 99-100, 105 S.Ct. 490 (finding *Edwards* triggered where defendant

However, the Wheeler Court avoided addressing the pre-*Miranda* waiver ambiguous request for counsel situation by finding that Wheeler had been advised of his rights under *Miranda* and had waived his right to remain silent. Since Mascioli was not in custody during the May 6, 2004, interview, *Miranda* was not implicated and the right to counsel warning was not implicated. Mascioli had the same ability to walk out of the interview room as he did to stop answering questions until counsel was present. The agents had no legal obligation to stop questioning him.

Finally, assuming Mascioli made a statement to the effect: "Do I need counsel for this?," if, under Davis and its progeny, such a statement was not sufficiently clear and unambiguous to cause cessation of a custodial interrogation, then it is axiomatic that such a statement is not sufficiently clear and unambiguous to be a basis for cessation of a non-custodial interrogation.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion To Exclude be **DENIED.**

Any party may, within ten (10) days after being served with a copy of this Report and

---

responded to whether he understood that he had a right to counsel, "Uh, yeah. I'd like to do that."); *Abela v. Martin,* 380 F.3d 915, 919, 926-27 (6th Cir.2004) (finding defendant invoked his right to counsel by stating, "[M]aybe I should speak with an attorney by the name of William Evans" and proffering Evans' business card); *Alvarez v. Gomez,* 185 F.3d 995, 998 (9th Cir.1999) (finding defendant's three questions, "Can I get an attorney right now, man?," "You can have attorney right now?," and "Well, like right now you got one?" constituted "an unequivocal request for an attorney"); *Kyger v. Carlton,* 146 F.3d 374, 376, 379 (6th Cir.1998) (finding statement "I'd just as soon have an attorney [']cause, you know--ya'll say there's been a shooting involved and that's a serious charge" in response to "[W]ould you answer some of our questions, without an attorney present?" constituted an invocation of the right to counsel) (first alteration in original).

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The clerk is directed to electronically provide copies of the within Report and Recommendation to all counsel of record.

DATED: August 12, 2005

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE